### ANCHOR CAP & CLOSURE CORP. v. PRITCHARD.

(District Court, S. D. New York. April 3, 1916.)

1. PATENTS &=>328—VALIDITY AND INFRINGEMENT—CLOSURE FOR BOTTLES AND JARS.
    The Hull patent, No. 779,751, for closure for bottles, jars, and other receptacles, was not anticipated and is valid; also *held* infringed.

2. PATENTS &=>328—VALIDITY AND INFRINGEMENT—CLOSURE.
    The Hull patent, No. 1,134,067, for closure, *held* not anticipated and valid, and claims 4, 5, and 6 infringed.

3. PATENTS &=>328—VALIDITY AND INFRINGEMENT.
    The Hull patent, No. 874,201, for a machine for sealing bottles, jars, and other receptacles, *held* not anticipated, valid, and infringed.

4. PATENTS &=>244—INFRINGEMENT—REVERSAL OF PARTS.
    A mere reversal of parts in a patented machine does not avoid infringement.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 385; Dec. Dig. &=>244.]

5. PATENTS &=>328—VALIDITY AND INFRINGEMENT.
    The Hull patent, No. 1,134,065, for machine for vacuum sealing, claim 1, *held* not anticipated, valid, and infringed. Claims 14, 15, and 16 *held* void for lack of invention.

In Equity. Suit by the Anchor Cap & Closure Corporation against Edward Pritchard. On final hearing. Decree for complainant.

James Q. Rice, of New York City, for plaintiff.

Fay & Oberlin, of Cleveland, Ohio (John F. Oberlin, of Cleveland, Ohio, of counsel), for defendant.

LEARNED HAND, District Judge. There are four patents here in suit which should be treated separately.

## Patent 770,751.

[1] This patent has no predecessors, except Kalling's two patents, 561,792 and 697,491. They differed from Hull's disclosure, because the bead was deformed by squeezing it against the side of the glass. It makes no difference whether the gasket was of a hard enough consistency, so that the nearest edges of the bead never touched the glass, or whether it collapsed so far that a part of the pressure was between metal and glass. In either case, the glass had to bear the whole of a pressure sufficient to deform the bead. It is, perhaps, not surprising, therefore, that Hull should have testified that the breakage when he witnessed the test ran as high as 60 per cent., although the patentee was giving a demonstration in the hopes of a sale. This evidence, coupled with the fact that no commercial use of the patent has ever been made, makes the conclusion reasonable that the patent was impractical.

I therefore find, first, that the disclosure operated upon a different principle from the patent in suit; and, second, that it is invalid in any case, because it did not contribute to the art a practical device.

The next question is of infringement, and this turns altogether upon whether, in the defendant's cap, the bead's "upper and lower inner walls firmly bind against the upper and lower surfaces of a peripheral portion of said ring, and hold squeezed from said groove the other peripheral portion of said ring." The defendant's bead, upon their own statement, "holds squeezed from said groove the other peripheral portion of said ring"; the only question is whether "the upper and lower walls firmly bind against the upper and lower surfaces." If this clause means that it must be only because of the approach vertically of the upper and lower walls that the gasket is extruded from its former position, then I agree that the defendant does not infringe. What makes the gasket move out in their case is that the area of a cross-section of the bead is reduced, not only by the approach of the upper and lower walls, but by intrusion of the side wall, which is bowed in, in the form of a re-entrant angle. It is true that this re-entrant angle drives before it nearly all of the gasket, but not quite all. All the sections actually made show that the gasket is pinched between the upper wall and the upper side of the re-entrant angle, and between the lower side of the re-entrant angle and the false wire. In short, the former opening within the bead is made too scant, partly by the approach of the walls, and partly by the toggle action of the side of the bead, and the gasket is driven out by both factors; but the resulting pressure between the bead and the glass makes the gasket fill every part of the space left within the bead. The approach of the walls does pinch all of the gasket which the re-entrant angle does not extrude from the bead; all the elements of the plaintiff's operation are present, and in addition the added element of the toggle-like angle, help-

ing at once to press and extrude the gasket. The addition of this element does not, in my judgment, avoid infringement.

## Patent 1,134,067.

[2] There are two inventions set forth in this patent—one for a groove "formed from the excess metal of the beading"; the other for the application to a continuous walled vessel of the earlier patent. The defendant infringes the second invention (claims 4, 5, and 6), if it infringes the earlier patent at all, as I have found it does. Therefore the question under claims 4, 5, and 6 turns wholly upon validity.

The first question is of the prior use by Weller of the caps of Hull's patent, 795,284, upon the Phœnix finish bottles. Weller and Santen tell a straight enough story; they say that the Phœnix finish bottles ran somewhat unevenly, so that the caps would not fit. This led to a number of discards, and to use these up they ordered the caps from the Sure Seal Cap Company. If they did use them on Phœnix finish bottles, they certainly did practice the invention. That they did order and secure the Sure Seal Caps to the number of 330,000 in 1908 and 1909 every one concedes. That they used large numbers of them upon some bottles cannot likewise be disputed. The question then resolves itself into whether they used them upon Crown finish or Phœnix finish bottles, or rather whether they used them only upon Crown finish bottles. Although amply corroborated upon the purchase of the caps, Weller and Santen are not supported as to their use on Phœnix bottles; that rests solely on their memory. On the other hand, Hull says he went to Cincinnati to install the machine, and that while he was there they capped only Crown finish bottles; more than that he cannot swear. He does say, and Magrane confirms him, that such caps could not have been made to stay on catsup bottles which were pasteurized in an open oven, as they were pasteurizing them. The pressure would have forced off too many tops to make the effort commercially practical.

It does not seem to me that the use is proven beyond a reasonable doubt. Although Weller and Santen were obviously disinterested and honest witnesses, and it seems unlikely that they should have remembered the use of these caps on Phœnix finish bottles, if it were not so, it is of course possible that after seven years their memory may be at fault. If the caps were bought only to use on Phœnix finish bottles, why did not Hull see something of them? My doubt rests chiefly in whether the caps would have stayed fast. The Phœnix finish bottle has a slightly beveled top, and it seems to me most probable that under the pressures said to be generated when curing in an open oven they must have been loosened. Of course, I cannot myself speak of this matter; but the plaintiff's experts stand uncontradicted in respect of it, and the antecedent probability makes in its favor. If forced to choose upon a mere balance of probabilities, I might say that Weller and Santen were right in their memory; but when forced to apply the extreme test, that there should be no reasonable doubt about it, I cannot find the use proven.

There remains the question of whether the new use of the old patent to a straight-walled vessel is in itself patentable. Stated in that

way, perhaps, it is doubtful; but the new combination is not alone the cap, but the cap and the bottle. The prior art thought in terms of the coaction of these two elements, and it is unfair to treat them as though they could be separated functionally. It is quite true that no substantial change is necessary, once you have thought of putting such a cap on a straight finish bottle; but often the best inventions lie only in omitting what everybody thought necessary. That there was a great advantage in using a continuous wall is undoubted; it enabled the cap to be got off very easily and without danger of breakage. Why should not any one else have thought to do it before? I agree that in the case of goods which must be pasteurized it was impracticable to use these in open ovens, and if that were their only use, and they appeared at once after the pressure ovens were devised, I should be disposed to doubt their patentability. Their use is not so confined, however; they are used for many other purposes, and their use was in no sense dependent upon pasteurizing under pressure. It had apparently always been thought that some ridge or roll was necessary to hold on the cap. The first man who thought it was not necessary, and that the cap would stay on alone, contributed a real benefit, if it was only the benefit of daring to go without what the rest of the world thought necessary. When it turned out that he was right, he had helped the art, and ought to be allowed to hold his patent. The length of time that the art had been practiced before any one thought to omit the flange is good evidence that it took some one besides the ordinary routine craftsman to think of it.

I do not find it necessary to take up claims 2 and 3 under this patent. Indeed it would probably be necessary to reopen the trial to do so, because I excluded evidence relating to the meaning of the words "formed of excess metal in the beading"—a matter not clear from the mere patent. If the Circuit Court of Appeals should take a different view from mine with respect to claims 4, 5, and 6, it might be necessary that that proof should be taken, but, since all these claims are in one patent, the duration of the injunction will not be different, whether all or some only be sustained. As enough has been said to dispose of the actual device in suit, it seems hardly worth while to reopen the cause merely upon a chance which may prove to be of only academic interest.

## Patent 874,201.

[3, 4] This patent is for a machine for putting on the caps mentioned in the other patents. Claims 1 and 3 are in suit, and do not require separate consideration. The defendant infringes, unless infringement can be avoided by a mere reversal of the parts. In the patent in suit the jaws, 22, slide up and down in the casing, 20; the upper die, 34, remaining stationary. In the defendant's infringing device the jaws remain stationary, except for their pivotal action, and the die rises and descends to effect the capping. Of course, this avoids the claims literally, and, if literalism were all, there would be no infringement. However, a mere reversal of the parts will not avoid infringement. Walker v. Giles, 218 Fed. 639, 134 C. C. A. 395. The only question, therefore, is whether the claim is valid, or must be so narrowly con-

strued as to be confined to that relative movability set forth in the claim. Confessedly, the only anticipation is the patent to Asche, 538,-890. The examiner had Asche before him, and cited it against some of the claims, but not claim 3. He did cite it against claim 1, which was changed so as to refer only to the vertical motion of the jaws in deforming the bead. Asche had no such relative vertical motion, for his jaws came in from four sides laterally. It is suggested that the change in any event was not patentable, but I can see no merit in this contention. The machine is a complicated one, and it would be the merest speculation to say it was within the competency of the ordinary skilled artisan, whose ingenuity I am not disposed to rate very highly. It is quite possible that the scope of the patent must be held strictly to the disclosure itself; but that question is academic here, for the defendant has copied the machine faithfully, except for the mere reversal of the parts.

### Patent 1,134,065.

[5] In this patent two features of a second machine are concerned. The first, covered by claim 1, is the location of the spring, *47*, supporting the platform, *42* (Fig. 4), within the tube, *41*. This tube must have a motion relative to the bottom of the ceiling chamber, *73*, and must therefore be hermetically packed as indicated at *76*. The defendant has copied this, and urges in justification the prior patent to Landsberger, 842,320, which is the nearest reference. In this patent the platform, *25*, is movably supported on a rod, which in turn is supported by a spring, *49*. The spring is outside of the air chamber, and as the chamber must be airproof the rod must slide through a hermetic packing. The result is that the spring must be heavier, and the resiliency of the platform, *25*, less sensitive, than if the spring were within the chamber. It perhaps would not be difficult, when the matter was suggested to adapt Landsberger to Hull's device; but it was a convenient detail, which added a real and practical advantage to the operation of the machine. I do not feel disposed to say that it did not take any patentable ingenuity to make it. A decree may therefore go upon that claim.

The final invention is the locking doors, claims 14, 15, 16. There must be a door to the vacuum chamber, and this must be packed at its edges, and firmly held, or the air will come in. Various forms of door are possible, and the plaintiff has chosen one; that is, carrying the doors upon substantially parallel arms. Such arms were not new in mechanics, though they were new in precisely this situation. The case is close, but I should hardly consider the swinging of a door in such a way a patentable novelty. It seems to me a mechanical detail, on which the general mechanical arts offered several possible alternatives. I shall not, therefore, issue a decree upon these claims, which I think void for nonpatentability.

A decree will go in accordance with the foregoing opinion, without costs.